The next case we'll hear this morning is Solutions in Hometown Connections v. Kristi Noem and Mr. Gerard will hear from you first. Good morning, Your Honors, and may it please the Court. Bradley Gerard for the Nonprofit Appellants. DHS shut down an entire congressionally funded program, and its position is that no court can consider a challenge to that illegal action by the groups most seriously and irreparably harmed. That can't be. I'll start with the jurisdictional issues. As an initial matter, there are three buckets of claims, and the jurisdiction has to be considered separately for each of these claims. APA, separation of powers, and ultra-virus. I'll start with the APA. Whether the District Court has jurisdiction under the APA, or the Court of Federal Claims has jurisdiction under the Tucker Act, turns on whether the District Court orders the payment of specific sums due. As DHS concedes in this case, there are no past sums due. As part of the challenge termination, the nonprofits will all be paid for any work that they have done. To the extent that there's any possible money in the future, it comes in the form of reimbursement. There's no specific sums that could be due in the future under these grants. That amount is indeterminate. The provision of legal services as a part of these grants really shows why. I'd like to highlight that, because I think it's a really important practical point, not merely a conceptual one. As part of these grants, each of the nonprofits has to provide legal services to a host of clients. As we highlight in our brief, once they accept these clients, they have an ethical duty to continue to represent them. As any practicing lawyer knows, once you accept a client, you can't say, this is going to be the exact number of hours that it takes to represent this client. It's something that develops over the scope of the representation. Under this grant, the nonprofits provide those services. Then they go back to DHS, and they seek reimbursement. This is a classic strings-attached type of grant that LUMMI, as we highlighted in our brief... I think you're leaving out a lot of the facts. As you opened up your argument, you basically started with the notion that the executive just ended a program without getting into the details, as I understand it. I think the monies here were appropriated to USCIS for use in the citizenship and integration grant program. That program was created by the executive. They went to Congress and asked for some money to fund that program. It is an executive program to carry out the overall mission that Congress gave it under the USC. The executive created the program. Why couldn't the executive end the program and return the money to Congress? In other words, ending the program... The program was not created by Congress. The program was created by the executive. The executive could just as well have spent that money directly, but it asked for the way it wanted to discharge it. It created a program, and Congress allocated money for that program. The executive could just as well say, I don't think that is efficient. In this case, the loans letter of January basically said she wanted to pause the programs to review them. Then they sent freeze letters to the grants. Finally, which also said the same thing, pause to review them. Then finally in March, they sent termination letters to your clients. We don't know who else was terminated. You say on information and belief, others were, but that doesn't carry a burden of saying they closed down the whole program. They closed down your 10 grants. They terminated your 10 grants under a program that they created. These facts have some importance in relation to the overall issues that we're getting like in the first case, which I think they're quite distinctive in my own view. I'd be interested in hearing you address that aspect. Yes, Your Honor. I think there's two important points in response. One is factual, the other is legal. As to the factual matter, the termination of CIGP, DHS has never said that CIGP was not terminated. It's never said, oh, we actually want to spend this money on other parts of this. They don't need to explain that to you. Basically, the record shows that they paused the programs to review them. Following those pause notices, first by the secretary and then later individually to each grant, they terminated the 10 plaintiffs' grants. Well, Your Honor. They said basically they didn't have all this background that you're positing. Well, Your Honor, I want to push back a little bit. I think the termination email, DHS included every CIGP grant recipient. It wasn't just an email that went to our 10 clients. It went to every CIGP grant recipient. Where's that showing the record? I'll have to dig up a pin site from the complaint. Well, I saw the complaint. The complaint says on information and belief, you believe everybody was terminated. The government has never pushed back on that. We're on a preliminary injunction. You have to show that basically they never said they're ending the program, but they said they're pausing it and reviewing it. They did review it. They ended 10 grants here. My question goes back. It's a multi-step question, but the main one is the program is not congressionally protected. The program was funded at the request of the agency, but it was created by the agency. I'm glad you went back to the main point because I think that's really important. It's true that the program was created by the agency. I think DHS's argument might be a lot stronger here. Prior to 2019, the way that Congress appropriated funds was generally to USCIS for immigration integration programs. In 2019, Congress ratified CIGP specifically. It started in the Appropriations Act, naming that the money goes to CIGP. At that moment, that became a program that DHS, the secretary, just does not have the power to cancel. I don't understand. It doesn't follow. If an executive creates a program, which they did in this case, and then they go to Congress and said, we'd like some money to fund that program. Congress said, okay, and they use the word is available for that program. It seems to me, and there's no other strings attached, it seems to me that doesn't say Congress isn't saying, you have to have that program. Well, Your Honor, I think we're getting a little bit into the merits of the separation of powers argument here. Well, it's fairly important because in this case, the district court denied the injunction and reviewed all this. I think this creates some hurdles that you have to meet. And then you can't just address the fact that the executive disagreed with Congress and tried to end a program created by Congress. Well, Your Honor, I think I'll stick with the separation of powers for right now to boil this down to the most simple understanding. And I think this makes this a lot easier than the prior case where government counsel said, look, there are statutes. The minute that there's a statute, this becomes a problem for the plaintiffs. You can't have a separation of powers claim. The fact that here we only have CIGP mandated by Congress through an Appropriations Act highlights... It doesn't mandate it. It's important that you stick with what is in the record. It doesn't help the argument when it provokes a response that you're overstating your case. Congress never mandated it. Congress said these $25 million or whatever the sum was, was available to this program, which had been created by the agency and for which the agency requested funding. Your Honor, I think... I'd be happy to go back and do some extra briefing on this if this would be helpful. I think over the last 50 years, this is the way that Congress in Appropriations Acts, in the language that it mandates that the executive spend money. It will say, this much money is available for this when Congress wants to give discretion to the executive and knows how to do it. And that's been true throughout history. Agencies have not spent all the money and have returned it to the Treasury. Supreme Court building was built with an appropriation and money was returned to the Treasury. At the end, they didn't spend it all. And I think there might be some tough cases where it gets a little closer, where it's not spending of every cent. But I think this one is an easy case for that where Congress appropriates money for a program and DHS says, we are no longer running this program. Can we talk about the actual injunction you requested though? The injunction you requested, you didn't ask the District Court to order the executive to make funds available, use funds for this program. You asked the District Court to undo the grant terminations. So to order the executive to pay these particular grants, right? I disagree, Your Honor, respectfully. I think if I can point you to JA-56. I'm looking at JA-581, your proposed order granting motion for preliminary relief. And what we have asked at the highest level is the court to vacate and set aside the termination of CIGP. Not in your PI, you didn't. I believe that I would have to look at, I don't have the specific language for the PI proposed order. But I think if you look at our briefs, if you look at the prayer for relief complaint, if you look at the arguments that we've made, it's been clear. Well, the Supreme Court has told us that Justice Gorsuch said an order vacating the government's decision to terminate grants is in every meaningful sense an order requiring the government to pay those funds, right? I understand that. So you requested the District Court to order the vacature of the terminations. Yes, so this, obviously the proposed order came before NIH. And I think we might have worded it a little bit differently. So the proposed order is J581, is that correct? I believe so. Yeah, I think you should. Because I'm seeing, I agree that you do that. But it basically also said, well, it says, would enjoin the government from pausing, freezing, impeding, or blocking grants on the basis of the January 28, 2025 memorandum issued by Defendant Secretary Noem or the February 4, 2004, 2025 letter from the Department. So is that the part that you would word differently now? Because what you're asking to do is to pause, freeze, impede, or block on the basis of, is that the part that you would phrase differently in light of NIH? Yes, I think so. So I'm happy to have this now in front of me. The first request in the proposed order is order that Defendant shall not dismantle the CIGP program. Including by, so. Well, you described in your brief that you don't really have a dismantling claim. It's three acts, right? You said dismantling is the memo where the Secretary said we are immediately freezing funds. And the letters informing the grantees that their funds have been frozen. And then the terminations, right? That's the dismantling. Yes, I think all together it shows that DHS has, again, and I don't think DHS says to the contrary, the termination of CIGP. The first thing we ask for is in order that the termination be vacated. Now, post-NIH, to Judge Hyten's question, I think the way we might word it is set aside, vacate the termination of CIGP. And from there. Or the no memo. Or the no memo. And we could let the agency. The no memo, it just said effective immediately these funds are paused, right? Yes, but it's the. That did the freezing and then it was implemented, the termination implemented that permanently. It's not like a policy memo saying like henceforth it shall be against the policy of this office to fund this particular program. I'm instructing my subordinates to go forth and, you know, find grants that need to be, you know, terminated and report back to me. Instead, she said effective immediately funds are frozen. Yes, and I think that actually puts us more on the concurrence, high level agency action. I would have thought it would put you less in it because she drew a distinction. She said setting aside the agency policy memo wouldn't necessarily cause the grants to be paid or not paid. She said those two don't necessarily flow legally from each other in that case. Here it seems like they are one and the same. I disagree, Your Honor. I would like to go back to Bowen which both NIH and California recognized as still good law. I think it's important because all these cases read together, especially in light of Justice Barrett's concurrence, mean that the APA allows injunctive relief that might result in some indeterminate amount of money in the future. The Tucker Act applies to orders to pay specified sums of money now. In those cases, the reinstate these grants, that's just effectively an order to pay the specified sum of money now. The Supreme Court has told us that that applies to claims on contracts, not just sums that are past due, sums that are due now. It applies to claims on contracts. Well, Your Honor, I don't think the Supreme Court has said that any claim on contract goes to the Court of Federal Claims. I don't think the court can be... You don't think so? I don't. I don't think it can be read to have totally overruled Bowen. And I think... It does not provide the district court with jurisdiction to adjudicate claims based on grants? I think the gravamen there is really claims for the payment of money. And that's what a lot of the grant cases are. They said, or to order relief designed to enforce any obligation to pay money pursuant to those grants. Two things. I don't read NIH as making that broad a... I mean, that would be a sea change in the law to say the Tucker Act, which gives very specific jurisdiction over very specific types of claims to a breach of contract, breach of contract claims, it doesn't mean that anything that involves a contract goes to... No, it means any claim on a contract. Exactly. And I think this is where Megapulse comes in. Right. Where then we look to see, okay, well, what is the relief that is available? What's the relief that's appropriate? And what are the source of the rights? And to the relief that's available and appropriate, as I've said, the case law makes clear that there is no contract claim in the Court of Federal Claims with this kind of situation. There's no past due sums. And LUMMI, the Federal Circuit, makes clear when we're talking about this kind of strings attached grant where the only way we can determine what money might be due in the future in the Court of Federal Claims has no jurisdiction to consider that because that's not a breach of contract claim. That is not a claim that is ordering the repayment of some kind of past sums. Where did the district court abuse its discretion? Well, I think the district court got the law wrong. In what respect? Well, I think... I have 20 seconds left and I think focusing on the APA specifically, one of the first places that it got it wrong was to say that that's the source of the legal rights. And that's simply not the case under any of this case law, whether that's Megapulse or Crowley. But the source of your standing can be different than the source of the legal rights? That's exactly right, Your Honor. I see my time is up. Okay. All right. Ms. Dillon. Good morning, Your Honors, and may it please the Court. My name is Jessica Dillon and I represent the federal government in this appeal. The district court properly concluded that this grant termination case belongs in the Court of Federal Claims. These claims are no different from the claims that the Supreme Court found must be brought in the Court of Federal Claims in the NIH and Department of Education in California cases. The same fundamental facts are involved. The agency directed a mass termination of grants and the grantees have brought claims challenging those terminations and seek reinstatement of their grants. In this case, the plaintiffs tried to sidestep that rule in two ways. The first, by framing their claims as directed at the dismantling of the grant program writ large. And second, by framing their claims in constitutional and ultra-various theories. The district court correctly rejected both of these efforts. First, the plaintiffs framed their claim as being directed not at the individual terminations of their grants, but at some abstract, high-level agency decision to terminate the program. And maybe they lose that claim, but I don't understand why the Supreme Court's decision in NIH doesn't say that's at least a claim you're allowed to make. So in NIH, and I think this might have been one of the most recent cases, the guidance documents were policy memoranda that set forth ongoing agency policy that NIH wouldn't fund certain categories of research. So the plaintiffs could seek in district court prospective relief against the enforcement of these policies. And Justice Barrett explained importantly that there was a legal distinction between the challenge to the grant terminations because vacating the guidance policy memoranda here. There's no distinction between the termination of the grant program and the terminations of the grants themselves. And termination of the program, according to the plaintiffs, is made up of the agency actions, freezing and then terminating the grants. And the relief sought is to vacate and set aside those grant terminations, which is precisely the relief that the Supreme Court held and I believe so much so that we should just rule for you on this from NIH, how? I genuinely don't, I mean, I understand your view is that they're wrong. Your view is that their view that the no memo is really just, your view is that you can't separate them, your view is that there's no real policy in the memo, but that's just an argument the plaintiffs are wrong, not just, not an argument that the district court lacks jurisdiction to hear that argument. So, I think that the framing as being dismantling the program, the decision to dismantle the program, they're saying that that decision was three things, the no memorandum, the freeze letters, and then the termination letters. Right. So, if those are the agency actions that are at play, they don't even argue that there's a decision But in fairness, everyone litigated this case before the district court, before NIH, right? And I don't blame anyone, I don't blame the government, I don't blame the plaintiffs, I don't blame the district court, but no one was litigating this case in light of NIH before the district court. So, of course, the way people litigated this case before the district court doesn't reflect a decision in NIH that hadn't been made yet. So, I understand that, but I do think that this actually, in a lot of ways, reflects what the what the plaintiffs would try to do had I think they are trying to fit this into the NIH guidance. And there's just no there's no agency decision that is a discrete agency action that they point to. They don't even argue that And again, that's an argument that they're wrong. That's an argument that their claim would fail. It's not an argument that the district court doesn't have jurisdiction to hear the claim. So, the argument is that the reframing is not meaningful is not that if you still if you look at the the apply megapulse the source of their rights and the relief sought all point to this being a claim designed to enforce a contractual obligation. And that falls squarely within NIH. And I think I think it might help to show what a claim might look like that perhaps would fit more closely with NIH. And that would be a claim where there's there's a final discrete agency action setting forth a policy that to close a program that is statutorily mandated to exist. And a plaintiff could challenge that policy seek to set aside that policy for the future such that whatever decisions the agency were to make about grants going forward they couldn't rely on that policy. That would be more like NIH. But that bears no resemblance to this case because there is no policy like that. The agency action What is the no memo if not a policy declaration? Why does the Secretary of Homeland Security issue memos if it's not a policy document? You get memos from the Attorney General. Those are policy documents, right? Like when the Attorney I used to work at DOJ. Memorandum to everyone who works for DOJ from the Attorney General. It would have never once occurred to me that that is not a policy document. So the no memorandum all it did was instruct that disbursements to non-profits related to immigration grants are on hold pending review. Yes. And that seems like pretty obviously a policy decision. And again, maybe it's a good decision. Maybe it's a bad policy decision. Maybe it's an illegal policy decision. Maybe it's an illegal policy decision. But it seems bizarre to say that's not a policy document. So a few things. I think that so that and then so the freeze letters sort of piggybacked off of the no memorandum and paused the disbursements of grants. Right. They implemented the policy announced by the Secretary of Homeland Security. So I think the problem with that is that now that pending review is over.   the the grants were reviewed. They were terminated. And and so there's really no Well that's an argument that's a mootness problem if they want to challenge the no memorandum. But again, that's not an argument that they can't do that they couldn't ever do it. It's maybe an argument that the claim is now moot. So we made that argument that the moot that that But that's not the ground the district court ruled for you on. I'm sorry? That's not the ground the district court ruled for you on, is it? Um And again, it's not the district court. I don't blame the district court for this. The district court was acting before NIH. I think the district court just took a blunderbuss approach and said you can't bring any of these challenges to any of these things. None of these challenges at any time were valid. Go away. And again, it was before NIH. I'm not blaming the district court for that in any way. But that's how the the district court didn't say well, maybe they would have had a valid claim to the no memo, but that claim is now moot. That is not the ground on which the district court ruled in your favor. I agree with you. Um that the district court didn't say anything about the mootness of the no memorandum. Um But I think the fact still remains that that if the if that's what the the plaintiffs were seeking were just to overturn the no memorandum and not do anything about the terminations No, no, no, no. So hold on. The claim that Justice Barrett said in NIH that they can bring to the district court everyone knows why the plaintiffs are actually bringing that claim. They hope and aspire and goal. But like we don't assess whether someone can bring a claim based on our assessments even if plausible what the person ultimately hopes to get from it. Right? I mean that's the argument that the other eight justices in NIH probably all agreed on which is that the splitting of these claims in the way that Justice Barrett said we should do doesn't make a lot of sense and which a point in which the court I think was eight to one. Unfortunately the one in this case was more than the eight from their perspective. But the plaintiffs and the claims that were allowed to proceed in district court in NIH the reason the plaintiffs are pursuing those claims are at least in part because they wanted things to continue to happen in the world.  Or at least it seems very plausible that's the reason they would do them. So I suppose that's why a plaintiff would bring any claim. Sure. Because they think it will help them somehow and some way. People don't pursue litigation for the heck of it. Can we talk about the injunction that the district court denied? I mean that's what's on appeal, right? Yes. If the district court had issued an injunction vacating the secretary's memo what would that have done? Would it have given the plaintiffs any relief? So your honor I don't believe it would because the terminations The grants were terminated. Right. Not by the memo. Exactly. Right. No memorandum did not tell DHS you must eliminate all grant programs having to do with immigration. It just put those programs on hold. And the or those grants on hold. And so that it would be impossible. The only agency actions here are the termination letters. They superseded the no memorandum and the freeze letters to the extent that they were even final which we would Yeah. To the extent we're talking about practical relief in the real world which is what an injunction would be we'd have to we'd have to set aside the terminations, right? Right. So your honors I want to briefly address just on the Tucker Act issue a secondary aspect of this case which is that there are two plaintiffs whose grant agreements were obligated in 2024 and those 2024 grant agreements include a specific disclaimer of any entitlement to money damages. And in the Federal Circuit there is a recognized exception to Tucker Act jurisdiction where a contract expressly disavows money damages and it's for this reason that the government did not press the jurisdictional argument with respect to these two plaintiffs in the court below. However, the district court still properly denied the preliminary injunction as to these two plaintiffs because plaintiffs reframing of their claims away from the terminations of their individual grants and now broadly challenging how the program is being run created a separate problem. It turned this case into a sweeping program-wide attack against the agency. I thought the court only ruled on the 23 grants. I didn't think those other ones were before us. No. That was in the... There were two decisions on the preliminary injunction. The first, you're correct. The second, Judge Grigsby also ruled that there was no discrete agency action and then her third ruling was that there was no... And this goes to Judge Neumeier's point earlier that there's no statutory mandate here and nothing that requires the grant program and so there was no conceivable separation of powers after Rear's claim. And so the district court correctly found that the plaintiffs had failed to demonstrate a likelihood of success on the merits both because of the jurisdictional bar that I just described with respect to the vast majority of the plaintiffs with the 2023 grants and as to all of the plaintiffs because their claims did not identify any discrete agency action that is reviewable under the APA. And the other way that the plaintiffs tried to avoid Court of Federal Claims jurisdiction is by addressing up their claims as constitutional and asserting ultraviarious theories and once again, the article pleading does not alter the underlying contract-based nature of their claims and even if the court were to treat them as distinct claims, they still lack merit because fundamentally the agency action is squarely within its statutory and regulatory authority as well as under the grants themselves which not only do not prohibit termination of the grants, they include expressed termination clauses and regulations that provide for it. Plaintiffs' separation of powers and ultraviarious claims rely upon alleged violations of congressional appropriations but as the district court correctly found, the grant termination did not violate the Appropriations Act nor did they violate any other statute or regulation identified by plaintiffs. So if there are no further questions. Thank you, Ms. Dillon. Thank you. Mr. Dry. Thank you, Your Honor. Just a few points quickly. As to the fiscal year 2024 grantees, the DHS raises a new article                and it's brief. What it said was, well, the claims by the fiscal year 2024 grantees are claims that are for broad injunctive relief and I think that's an important concession here because it's the same exact claims brought by the fiscal year 2023 grantees requiring the same exact analysis, requiring the same exact relief. Now, to the relief, to Judge Rushing's question about practical relief in the real world, I think this helps to show why this case can fit squarely under Justice Barrett's concurrence in NIH and I think that the ordering the vacature if it's an APA, if it's APA relief, ordering an injunction if it's equitable relief under the separation of powers, the result is the same that it's setting aside and vacating the termination of the CIGP program and I think what that means specifically is a practical point is really for the, it's a question for the district court and the agency in the first place but I can point to something in the uniform guidance that shows how this could play out in a way that the government could achieve its policy ends, the non-profits could continue to carry out their programs so 200, 340, A2 in the uniform guidance, for example, it allows partial termination of grants but the parties have to negotiate the terms and so DHS can go back and say, okay, well, under our changed policies we want to renegotiate the terms of the grants, we'll continue the grants with you but we really want you to focus over here to carry out these policies, that's something that can be done and I also think the fact that the non-profits would have the ability to reapply for the grants in the future would, that matters and point the court to JA505, JA535 to 36, specifically the plaintiff ESLC, they've done these, they've been a part of the grant program since 2009 and they've stated that they plan to apply in the future and the relief of setting aside and vacating the termination of the grant program would not only allow them to continue doing the work that they're already on the hook for with this legal representation but would also allow them to reapply for it in the future and so I think that just gets to one of the practical points and then as a final point I just want to highlight that I do think it's important to separate the merits and the jurisdictional questions in this case and I think it's easy for them to get mixed up I think under Megapulse especially looking at the relief that would be appropriate here and the fact that the Court of Federal Claims simply could not grant the non-profits any relief at all shows why this is squarely not a contract claim. Thank you very much. Thank you. We'll come down Greek Council and take a short break.
judges: Paul V. Niemeyer, Allison J. Rushing, Toby J. Heytens